**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:11-CR-0166** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **DAMIEN HAMMONDS**, | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the court is defendant Damien Hammonds' motion to suppress
evidence. (Doc. 185.) Hammonds contends that, on June 2, 2010, law-enforcement
officers violated his Fourth and Fifth Amendment rights when they detained and
questioned him in the international airport in San Juan, Puerto Rico shortly after
he arrived there by plane from Pennsylvania. The court held an evidentiary hearing
on the motion on December 15, 2011. For the reasons that follow, the court will
deny the motion.

## I.  Findings of Fact[1]

Puerto Rico is considered a source area for drugs coming from South
America, Central America, and the Caribbean into the continental United States,
particularly cities on the East Coast. (Hr'g Tr. 8:5–9.) Although most drugs entering
the United States come through the country's southern border, Puerto Rico is
nonetheless a major transit point for drug trafficking because of the way customs

---

[1] Testimony presented at the December 15, 2011, hearing on the motion
forms the basis for these findings, which reflect the court's assessment of the
credibility of the testimony provided. Citations to the transcript from this hearing
are abbreviated throughout as "Hr'g Tr."

operates there. (Id. 8:9–15.) U.S. citizens that pass through customs upon arrival in Puerto Rico may return to the continental United States without passing through customs again, effectively creating a security gap that facilitates drug smuggling. (Id. 8:16–19.)

When drugs originating from Puerto Rico are sold in the continental United States, the proceeds typically return to Puerto Rico in the form of bulk cash smuggling—in other words, via Americans, traveling to Puerto Rico on commercial airline flights, concealing money on their person or in their carry-on luggage. (Id. 8:19–9:4.) The drug-trafficking economy in Puerto Rico thus consists primarily of cash flowing in and drugs flowing out, a pattern that holds particularly true in the case of cocaine and heroin. (Id. 9:5–10.)

On June 2, 2010, Special Agent Jason Staab-Peters of the Drug Enforcement Agency was acting supervisor of the airport interdiction group at Luis Munoz Marin International Airport in San Juan, Puerto Rico. (Id. 5:7–12.) This interdiction group's general purpose was to investigate persons suspected of violating U.S. drug laws. (Id. 5:16–17.) At the airport, the group conducted interdictions for persons transporting drug proceeds or attempting to smuggle drugs or other contraband from the airport onto commercial flights and into the continental United States. (Id. 5:17–22.) Under Agent Peters' supervision in the interdiction group were two other special agents and four or five task force officers—local police officers who had been deputized and had the same responsibilities and powers as the special agents. (Id. 6:6–13.) Group members wore plainclothes rather than uniforms; Agent Peters

typically wore a suit and the other group members wore "just normal street clothes." (Id. 7:13–21.) They carried firearms, but the weapons were concealed. (Id. 7:22–24.) Their office was inside the secured area of the San Juan airport behind the American Airlines baggage belts in an area that could be accessed only with proper identification. (Id. 6:18–7:12.)

On the morning of June 2, Agent Peters received information from an interdiction group at the Philadelphia airport that two individuals were en route to Puerto Rico aboard an American Airlines flight with "amounts of U.S. currency" concealed in their carry-on luggage. (Id. 9:21–10:3.) The Philadelphia group provided Agent Peters with detailed descriptions of the two individuals, including the lettering on their hats, the type of luggage they had, and their names: Marcelo Calderon-Ortiz and Richard Rondon-Diaz. (Id. 10:4–11, 11:18–12:2.) When asked why Calderon and Rondon were permitted to leave Philadelphia without being interviewed, Agent Peters responded:

> My understanding is that the cash was discovered in the carry-on suitcases at the TSA security checkpoint. Somebody from TSA tried calling the airport interdiction group, but as frequently happens there wasn't enough time for the airport guys that work with DEA to get to that checkpoint before that plane was already supposed to be leaving. So those two individuals were allowed to board the flight and were on their way to Puerto Rico at that point.

(Id. 10:12–25.) When Agent Peters received the information about Calderon and Rondon, he relayed it to other members of his group, and they prepared to meet the two men as they disembarked from their flight. (Id. 11:1–4.)

Around 11:15 a.m., the American Airlines flight carrying Calderon and Rondon landed in San Juan, and a task force consisting of Peters and three or four members of his interdiction team identified the two men and approached them in the baggage area of the American Airlines terminal. (Id. 11:5–12, 28:10–22, 14:14–15.) Agent Peters remained present as other members of his task force spoke in Spanish to Calderon and Rondon, identifying themselves as officers of the DEA and asking if the two men would speak with the agents or task-force officers. (Id. 12:4–9.) At this juncture, defendant Damien Hammonds was unknown to the interdiction group; he had been neither identified nor approached by anyone in Agent Peters' task force. (Id. 11:13–17, 12:10–12.)

While agents were talking to Calderon and Rondon in Spanish, Hammonds approached the group of officers and said, in English, "Hey, we're all traveling together." (Id. 12:14–20.) Once Hammonds had identified himself in this manner, Agent Peters, Agent Cruz, and task-force officer Rubino Rivera addressed Hammonds as well. (Id. 12:20–24.) The agents identified themselves as being DEA officers,[2] and Agent Cruz asked Hammonds if he had any identification on him. (Id. 31:7–15, 13:6–7.) When Hammonds reached into his pocket for a Pennsylvania identification card, Agent Cruz noticed "a large amount of currency in Mr. Hammonds' pocket, bundles of U.S. currency in his pants pocket." (Id. 13:7–12; see also id. 71:12–15 (Hammonds' testimony acknowledging that the money in his

---

[2] Agent Cruz showed his badge to Hammonds. (Hr'g Tr. 31:16–21.)

4

pocket was visible to the task force).) Agent Cruz said to Hammonds: "So you have large amounts of current currency on you? You have money on you?" and Hammonds replied that he did. (Id. 13:12–15.)

When Agent Peters was asked during the hearing what his initial thoughts were upon encountering Hammonds, Agent Peters answered: "Well, it was unusual to have a non-Spanish speaker traveling with two Spanish speakers to Puerto Rico without set travel plans. The whole thing . . . just didn't seem right." (Id. 54:16–24.)

After Hammonds verified that he was carrying large amounts of cash, Agent Peters and his task force asked Hammonds, Calderon, and Rondon if they would accompany the task force back to the DEA office. (Id. 13:12–17.) Agent Peters acknowledged that the purpose of the continued questioning was to determine the source and purpose of the money that Hammonds and his two companions were carrying, particularly to discern whether it was related to drug trafficking. (Id. 32:19–33:21.) The interdiction team indicated to the three men that they were free to leave, that they were not being arrested, and that the questioning was an administrative procedure, not a criminal investigation.[3] (Id. 13:18–22, 32:15–18.) All three men assented; the task force, escorting the men, headed toward the secured area where the DEA office was located. (Id. 14:7–10, 14–18.)

---

[3]  Hammonds testified that the task force "actually told [him] to come" with them rather than simply ask him if he was willing, and that they told him neither that he was free to leave nor that he was not being placed under arrest. (Hr'g Tr. 58:14– 59:23.) On this disputed point, the court finds Agent Peters' testimony to be more credible than Hammonds' testimony.

At hearing, Hammonds stated that he believed that he could not simply walk away from the task force or decline their request (id. 59: 5–19), but conceded that he was never handcuffed, that no one ever pulled a gun on him, that he was never told he was under arrest, and that nobody searched either his person or his luggage at any point during the initial encounter (id. 68:7–14, 75:10–15). When asked during the hearing which one of the agents grabbed his arm to escort him back to the DEA office, Hammonds answered, "None of them." (Id. 72:9–11.)

Agent Peters and his team reached the security checkpoint, produced their identification, and walked with Hammonds and his two companions into the secured area. (Id. 14:14–20.) They walked down a corridor to the DEA office, with Agent Peters in the rear, the three men in the middle, and at least one member of the task force in the lead. (Id. 14:20–21, 36:3–19.) Hammonds and his two companions, carrying their own luggage, retained possession of their airline tickets and ID cards. (Id. 14:22–15:8. See also id. 71:22–24 (Hammonds' testimony acknowledging that he was carrying his own luggage).) The bundles of currency that Agent Cruz had seen in Hammonds' pocket also remained in Hammonds' custody. (Id. 15:9–13. See also id. 71:16–18 (Hammonds' consistent testimony).) The task force placed the three men in separate rooms for questioning; Hammonds was place in a windowless room, about 120 square feet in size, used for evidence processing. (Id. 16:9–23; id. 40:18–25 (Agent Peters' estimate that the room was 15' × 8'); id. 62:5–6 (Hammonds' estimate of 10' × 12').) According to Agent Peters, there was no particular reason that Hammonds was placed in that specific room, which,

6

based on testimony at the hearing, contained little to nothing other than a table and chairs. (Id. 16:22–17:10, 41:2–4 (Agent Peters' testimony); id. 62:5–10 (Hammonds').) Inside the room with Hammonds were Agent Peters, Agent Cruz, and task-force officer Pacheco. (Id. 41:5–9.) Hammonds was "sitting down at the table" (id. 41:12) and had his back to the door (id. 62:15).[4] The door was open the whole time that Hammonds was there; nobody was posted at the door to prevent Hammonds from leaving. (Id. 17:11–16.) When Hammonds took a seat at the table, Agent Peters advised him that he was not under arrest and that he could leave at any time.[5] (Id. 41:22–42:4.)

Officer Pacheco began to gather some basic biographical information from Hammonds. (Id. 17:25–18:3.) He asked for Hammonds' ID again, which was photocopied and returned to him. (Id. 18:3–5.) The team then focused the questioning on the source of the money, "trying to determine whether it was from a legitimate source or if [it] was indeed drug proceeds that [were] coming down in the manner that [they] normally see." (Id. 18:5–12.)

Hammonds removed all of the cash from his pockets and began giving a number of disparate explanations for its source. (Id. 18:7–8, 13–16.) First he said the

---

[4] Agent Peters testifed that he "believe[d] [Hammonds] had his side to the door," but conceded that he "[did]n't recall exactly where" Hammonds was sitting. (Hr'g Tr. 41:13–16.) Hammonds testified with apparently clear recollection that his back was to the door. (Id. 62:15.)

[5] Hammonds' testimony on this point was contradictory (Hr'g Tr. 62:22–63:6), but the court finds Agent Peters' testimony more credible.

money came from his employment in construction, so the team queried him about that—e.g., what kind of construction work, the name of his boss, the boss's phone number, whether he had pay stubs or other documentation, the address of his place of work, etc. (Id. 18:16–23.) Hammonds then offered that some of the funds were from his savings, so they asked him about the source of his savings. (Id. 18:23–25.)

As a result of Hammonds' inconsistent answers, the agents asked whether there was "anybody [else] who [could verify] any kind of explanation" for the source of the money. Hammonds said he could call his aunt, indicating that some of the money also came from her. (Id. 19:6–7.) The first call he placed to his aunt went unanswered; Hammonds reached only her voice mail. (Id. 19:8–10.) She answered the second call, but hung up after Hammonds said something about getting stopped in Puerto Rico. (Id. 19:10–15.) A third call was placed, and this time, Hammonds' aunt stayed on the line. (Id. 19:16–18.) Agent Peters explained to her that the money might be subject to forfeiture if they believed it to be drug proceeds,[6] but she said the money had nothing to do with drugs. (Id. 19:24–20:3.) In a follow-up phone call that Agent Peters made to Hammonds' aunt sometime later, the aunt said that "she had given some of that money to Mr. Hammonds and then Mr. Hammonds had actually taken a few thousand extra, but that was normal for him." (Id. 20:14–18. See also id. 45:1–15 (clarifying that this follow-up phone call took place after the team was done questioning Hammonds).)

---

[6] Agent Peters had already conducted a records check and determined that Hammonds had a prior conviction for drug trafficking. (Hr'g Tr. 20:9–11.)

Hammonds signed a form consenting to the search of his three suitcases, following which the team brought in a dog trained to alert to the odors of narcotics, which they "ran . . . past" Hammonds' suitcases. (<u>Id.</u> 21:4–5, 18–20.) The dog gave no alert when passing over the suitcases, but later, when the team placed Hammonds' money inside an envelope and left it alongside some other empty envelopes in the hallway outside the evidence-processing room, the dog alerted on the envelope containing Hammonds' money. (<u>Id.</u> 21:5–14.) Hammonds watched from inside the room as the envelope-sniffing took place. (<u>Id.</u> 25:18–24.)

Meanwhile, Calderon and Rondon were subjected to similar questions in other interview rooms. (<u>Id.</u> 21:25–22:5.) After the drug-sniffing dog had alerted on Hammonds' money, Agent Peters and other members in the interdiction group met in the hallway to discuss the information provided by Hammonds and his two traveling companions. (<u>Id.</u> 22:7–10.) They quickly realized that "there was a very big difference in terms of what these guys were telling us." (<u>Id.</u> 22:10–12.) Calderon and Rondon had said that they were traveling with Hammonds, that all the money was his, and that they were in Puerto Rico to buy a kilogram of cocaine. (<u>Id.</u> 22:14–18.)

Consequently, Hammonds' money was seized; the agents gave him a receipt called a DEA-12, which described what had been seized (in this instance, "about $6,000"), along with a letter informing Hammonds that the money was subject to forfeiture but that he could file a claim to the money if he wanted to. (<u>Id.</u> 23:7–16, 24:6–8.) Hammonds, Calderon, and Rondon all left the DEA office at that point,

each having had the cash they were carrying seized.[7] (Id. 23:5–6, 17–25; 24:1–3.)

Agent Peters estimated that the interview lasted around thirty to forty-five minutes.

(Id. 48:14–24.)

## II.    Procedural History

By a two-count indictment returned May 4, 2011, a grand jury charged

Hammonds with (1) intentionally and knowingly manufacturing, distributing, and

possessing with the intent to distribute at least 280 grams of cocaine base and at

least 5 kilograms of cocaine hydrochloride, in violation of 18 U.S.C. § 841(a)(1); and

(2) conspiracy to commit the crimes described in Count I, in violation of 18 U.S.C.

§ 846. (Doc. 1.) Hammonds entered a plea of not guilty on May 6, 2011. (Doc. 47.) He

filed the instant motion to suppress (Doc. 185) on November 3, 2011. An evidentiary

hearing was held on December 15, 2011. The motion, now fully briefed, is ripe for

disposition.

## III.    Discussion

### A.    Seizures under the Fourth Amendment

The Fourth Amendment to the United States Constitution secures "persons,

houses, papers, and effects, against unreasonable searches and seizures" by law-

enforcement officers. U.S. Const. amend. IV. Interactions between law-enforcement

officers and persons may be consensual; in such circumstances, the person's willing

submission to the questions or directions of an officer implies no Fourth Amendment

---

[7] The three men had carried "a little over $22,000" in cash. (Hr'g Tr. 24:5.)

concerns. By contrast, when an officer places restraint on a person—thus placing the person under some degree of seizure—the Fourth Amendment's requirement of reasonableness applies, the requisite justification being commensurate with the extent of restraint. <u>See generally</u> <u>Dunaway v. New York</u>, 442 U.S. 200, 207–09 (1979) (reviewing the tenets of Fourth Amendment jurisprudence).

An encounter between an officer and a person may begin consensually but evolve into a seizure. As long as "a reasonable person would feel free to disregard the police and go about their business," an encounter remains consensual. <u>Florida v. Bostick</u>, 501 U.S. 429, 434 (1991) (quoting <u>California v. Hodari D.</u>, 499 U.S. 621, 628 (1991)) (internal quotation marks omitted). But when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen," a seizure has occurred. <u>Id.</u> (quoting <u>Terry v. Ohio</u>, 391 U.S. 1, 19 n.16 (1968)). Officers are free to ask questions, ask for identification, or request consent to conduct a search without imposing a seizure as long as they "do not convey a message that compliance with their requests is required." <u>Id.</u> at 434–35 (citing, <u>e.g.</u>, <u>I.N.S. v. Delgado</u>, 466 U.S. 210, 216 (1984); <u>Florida v. Rodriguez</u>, 469 U.S. 1, 5–6 (1984); <u>Florida v. Royer</u>, 460 U.S. 491, 501 (1983) (plurality opinion)).

Seizure of a person is generally reasonable under the Fourth Amendment only when supported by probable cause. <u>Dunaway v. New York</u>, 442 U.S. 200, 209 (1979). An officer has probable cause when the facts and circumstances of which the officer has knowledge and reasonably trustworthy information would suffice to allow "a man of reasonable caution" to believe that "an offense has been or is being

committed." Id. at 208 n.9 (1979) (quoting Brinegar v. United States, 338 U.S. 160, 175–76 (1949)). This standard is an objective one. Beck v. Ohio, 379 U.S. 89, 97 (1964).

The probable-cause requirement is subject to a narrow range of exceptions based on the Court's holding in Terry v. Ohio, 391 U.S. 1 (1968). Under Terry, "certain seizures are justifiable under the Fourth Amendment if there is an articulable suspicion that a person has committed or is about to commit a crime." Florida v. Royer, 460 U.S. 491, 498 (1983) (plurality opinion). Such "investigative" detentions do not allow the police "to verify their suspicions by means that approach the conditions of arrest"—they must be "temporary," lasting "no longer than is necessary to effectuate the purpose" of the detention, and undertaken using "the least intrusive means reasonably available to verify or dispel . . . suspicion in a short period of time." Id. at 499, 500 (citing  Dunaway v. New York, 442 U.S. 200 (1979); United States v. Brignoni-Ponce, 422 U.S. 873, 881–82 (1975); Adams v. Williams, 407 U.S. 143, 146 (1972)).

**B.    Application to this case**

Hammonds argues that when Agent Peters' interdiction team removed him from the public area of the airport, separated him from his travel companions, and placed him in a small room for questioning, the consensual encounter evolved into a de facto arrest requiring probable cause. Because probable cause was absent, the arrest was unlawful, and any evidence seized following the arrest should be suppressed. Hammonds contends that the conduct of the interdiction team was such that, under the totality of the circumstances, no reasonable person would have

felt free to terminate the encounter. He contends in the alternative that even if he were not the subject of a de facto arrest, he was temporarily seized, thereby requiring reasonable articulable suspicion—and the interdiction group, he insists, had no such articulable suspicion of him.

Hammonds primarily relies on <u>Florida v. Royer</u>, 460 U.S. 491 (1983) (plurality opinion). In that case, Royer had just finished purchasing a one-way ticket from Miami to New York City and checking two suitcases when he was approached by detectives. The detectives identified themselves as policemen and asked Royer if he had a "moment" to speak with them. <u>Id.</u> at 493–94. Royer said he did. <u>Id.</u> at 494. Upon request, "but without oral consent," Royer produced his airline ticket and driver's license, the former being in the name of "Holt" and the latter bearing Royer's actual name. <u>Id.</u> Royer became "noticeably more nervous" during the ensuing conversation, in which Royer attempted to explain the discrepancy between the names. <u>Id.</u>

Without returning Royer's airline ticket or identification, the detectives informed Royer that they were narcotics investigators, told him that they had reason to suspect him of transporting narcotics, and asked Royer to accompany them to a room, later described by one of the detectives as a "large storage closet," approximately forty feet away. <u>Id.</u> Royer, saying nothing, complied. <u>Id.</u> Once they reached the room, one of the detectives used Royer's baggage-check stubs to retrieve the "Holt" luggage without having obtained Royer's consent or agreement. <u>Id.</u> Royer was asked if he would consent to a search of the suitcases; without giving

13

any oral response, he used a key to unlock one of the suitcases, which one of the detectives proceeded to open without seeking further consent from him. Id. The detective found marijuana inside that suitcase, and shortly thereafter, the second suitcase was opened where additional marijuana was discovered. Id. at 494–95.

Before his state-court trial in Florida for felony possession of marijuana, Royer filed a motion to suppress evidence obtained from the search of his suitcases, but the trial court denied the motion, finding that Royer's consent to the search was "freely and voluntarily given." Id. at 495. Royer was convicted. Id. Sitting en banc, the Florida Court of Appeal reversed, holding that Royer's detention exceeded the kind of temporary seizure permissible under the Terry line of cases, that the detectives lacked probable cause to subject Royer to such involuntary confinement, and that the search of Royer's luggage was tainted by the illegality of Royer's confinement. Id.

The state appealed to and was granted certiorari by the United States Supreme Court, where a divided Court affirmed the Florida Court of Appeal. Id. at 508. Four Justices held that by the time the detectives asked Royer if he would consent to a search of his luggage, he was, as a practical matter, under arrest without probable cause. Id. at 502–03. The plurality reasoned that when officers searched his luggage "any consensual aspects of the encounter . . . evaporated" and Royer reasonably believed he was being detained:

> The officers . . . informed [Royer] they were narcotics agents and had
> reason to believe that he was carrying illegal drugs. They requested
> him to accompany them to the police room. Royer went with them. He
> found himself in a small room—a large closet—equipped with a desk
> and two chairs. He was alone with two police officers who again told
> him that they thought he was carrying narcotics. He also found that
> the officers, without his consent, had retrieved his checked luggage
> from the airlines. What had begun as a consensual inquiry in a public
> place had escalated into an investigatory procedure in a police
> interrogation room, where the police, unsatisfied with previous
> explanations, sought to confirm their suspicions. The officers had
> Royer's ticket, they had his identification, and they had seized his
> luggage. Royer was never informed that he was free to board his plane
> if he so chose . . . .

Id. The plurality further opined that although a Terry-type stop might justify "moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area," moving Royer to the police room in the airport did not advance any legitimate law-enforcement purposes. Id. at 504–05 (citing Pennsylvania v. Mimms, 434 U.S. 106, 109–11 (1977) (per curiam)).

In the matter sub judice, Hammonds maintains that his detention in Puerto Rico is analogous to the arrest found unlawful in Royer and that the same result should obtain here. This position is untenable, as Hammonds' comparison to Royer is inapt and the facts differ in critical aspects.

The Royer plurality identified four factual matters that substantially informed, if not outright determined, the plurality's conclusion; all four are absent in the instant case. First, the officers had Royer's ticket and identification, having kept them in their custody after Royer presented them. By contrast, Hammonds mantained control of his identification and ticket information.

Second, the detectives in <u>Royer</u> had retrieved and seized Royer's suitcases after they had already been checked in and without Royer's consent. In the present case, Hammonds retained custody of his luggage throughout the encounter with the interdiction team.

Third, whereas Royer was never told that he was free to leave, Hammonds repeatedly was. Fourth, the <u>Royer</u> Court found that there was no justification, such as safety or security concerns, for the detectives to remove Royer from the public area of the airport to the police room. In Hammonds' case, a simple justification readily presents itself: Agent Peters' task force sought to question three individuals contemporaneously about whether the money they were carrying was related to drug trafficking, and standard investigatory technique dictates that individuals who may be collaborators in a criminal venture should be questioned separately in order to elicit answers from each without influence from the others. Moreover, the number of subjects being questioned in this case—three, as opposed to the solo-traveling Royer—implicates security and safety concerns in a way that the scenario in <u>Royer</u> did not.

The instant matter presents none of the facts that led four Justices to determine in <u>Royer</u> that an arrest had occurred, rendering <u>Royer</u> an ineffective basis for Hammonds' contention that his detention constituted an arrest, as indeed it was not.[8]

Hammonds' alternative argument based on the purported absence of a reasonable articulable suspicion is equally unavailing. As the following paragraphs explain, the interdiction group clearly had a reasonable articulable suspicion that Hammonds had committed or was about to commit a crime, and Hammonds' detention did not exceed the bounds of the sort of temporary seizure that <u>Terry</u> and its progeny permit.

Reasonable articulable suspicion of Hammonds developed nearly as soon as he interjected himself into the conversation that Agent Peters' interdiction team was having with Calderon and Rondon in the baggage-claim area of the airport. By virtue of his own conduct, Hammonds planted the seed of an articulable suspicion. He volunteered himself to the interdiction team as a traveling companion of Calderon and Rondon, while they were being questioned by the agents. As Agent Peters testified, the three men presented an unusual situation: Hammonds, who spoke only English, was traveling with Calderon and Rondon, who spoke only

---

[8] The conclusion that Hammonds was not placed under arrest obviates any need to address his Fifth Amendment argument, since the Fifth Amendment right against self-incrimination arises only upon a suspect's being placed under custodial arrest. <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977); <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>United States v. Leese</u>, 176 F.3d 740, 743 (3d Cir. 1999) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)).

Spanish, and they lacked set travel plans. To Agent Peters, "[t]he whole thing . . . just didn't seem right." (Hr'g Tr. 54:16–24.) Once Hammonds had addressed the interdiction team and drawn attention to himself in this manner, the first question that Agent Cruz asked him was whether he had any identification on him; as Hammonds fished in his pocket for his ID card, the seed of reasonable articulable suspicion matured when large bundles of U.S. currency in Hammonds' pocket became visible to Agent Cruz. The interdiction team had already known that Calderon and Rondon had come to Puerto Rico from a large East Coast city on a commercial airline flight with large amounts of currency concealed in their carry-on baggage; now they knew the same of Hammonds. When these facts are viewed in conjunction with the interdiction team's knowledge and experience of the channels of drug distribution—that Puerto Rico is a major transit point for drug trafficking and that proceeds from drug sales in the eastern United States typically return to Puerto Rican drug-trafficking organizations via persons carrying large amounts of concealed cash flying into the country on commercial airlines—a reasonable articulable suspicion of Hammonds becomes unmistakably evident. Cf. Florida v. Royer, 460 U.S. 491, 502 (1983) (plurality opinion) (opining that Royer's traveling under an assumed name and paying cash for a one-way ticket, combined with "the mode of checking [his] two bags" and his "appearance and conduct in general," gave rise to a reasonable suspicion against him).

Such reasonable articulable suspicion as the interdiction team had of Hammonds justifies an investigative detention of the sort first described in Terry v. Ohio, 391 U.S. 1 (1968), and developed in subsequent jurisprudence. As previously

18

stated, seizures of this kind must be "temporary," lasting "no longer than is necessary to effectuate the purpose" of the detention, and undertaken using "the least intrusive means reasonably available to verify or dispel . . . suspicion in a short period of time." Royer, 460 U.S. at 499, 500 (citing Dunaway v. New York, 442 U.S. 200 (1979); United States v. Brignoni-Ponce, 422 U.S. 873, 881–82 (1975); Adams v. Williams, 407 U.S. 143, 146 (1972)).

Royer addressed why the police conduct at issue in that case was "more intrusive than necessary to effectuate an investigative detention," id. at 504, and every matter of fact that the Court discussed in this context appears in the instant case in an opposite form. First, if the detectives had returned Royer's ticket and driver's license and informed him that he was free to go if he wished, "the officers may have obviated any claim that the encounter was anything but a consensual matter from start to finish." Id. at 504 (dicta). In the present case, Hammonds' identification and other materials were returned to him promptly and he was repeatedly told he was free to leave. Second, unlike the police conduct at issue in Royer, here the interdiction team's decision to move the questioning to a private area furthered the legitimate law-enforcement purpose of conducting effective questioning of three subjects at the same time. Third, the detectives in Royer had, without Royer's consent, retrieved and seized his baggage, then opened one of his bags and searched through its contents. The Court observed that it may have been "feasible to investigate the contents of Royer's bags in a more expeditious way," specifically noting that the use of trained dogs would have been faster and less intrusive. Id. at 505–06 & n.10. And indeed, in this case, the only inspection of

Hammonds' baggage consisted of "[running] the drug dog past" his three suitcases. (Hr'g Tr. 21:5–9.) See also United States v. Place, 462 U.S. 696, 707 (1983) (holding that exposing a "trained canine" to luggage in a public place is not a "search" within the meaning of the Fourth Amendment). Cf. Illinois v. Caballes, 543 U.S. 405, 409–10 (2005) (holding that using "a well-trained narcotics-detection dog" during a lawful traffic stop "generally does not implicate legitimate privacy interests" and does not violate the Fourth Amendment).

Agent Peters and his task force had a reasonable articulable suspicion that Hammonds was committing or was about to commit a crime. The ensuing investigative detention was justifiably undertaken outside of the public area, before and during which Hammonds was reminded that he was free to leave at any time, and throughout which Hammonds retained possession of all his belongings, the only exception being the seizure of Hammonds' money after a trained dog alerted to the scent of narcotics on it. Hammonds was neither handcuffed nor patted down; his person was never searched; his luggage was inspected only to the extent that it was sniffed by a trained dog. The questioning during the detention remained focused on the effort to verify or dispel the suspicion that Hammonds' bundles of U.S. currency were related to drug trafficking. Once that suspicion was verified, Hammonds was, in short order, released from the temporary detention. The police conduct at issue in this case remained squarely within the strictures imposed by the Fourth Amendment.

**IV.** **Conclusion**

For the foregoing reasons, the motion to suppress is DENIED. An

appropriate order follows.


                                  _S/ Christopher C. Conner_
                                  CHRISTOPHER C. CONNER
                                  United States District Judge


Dated:      April 18, 2012

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:11-CR-0166** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **DAMIEN HAMMONDS,** | : | |
| | : | |
| **Defendant** | : | |

## <u>ORDER</u>

AND NOW, this 18th of April, 2012, upon consideration of the motion to suppress (Doc. 185) filed by defendant Damien Hammonds, and for the reasons stated in the accompanying memorandum, it is hereby ORDERED that the motion to suppress is DENIED.

                 <u>S/ Christopher C. Conner</u>
                 CHRISTOPHER C. CONNER
                 United States District Judge